**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| WILLIAMS-SONOMA DIRECT, INC. and WILLIAMS-SONOMA RETAIL SERVICES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | No. 2:14-cv-02727-JPM-tmp |
| ARHAUS, LLC d/b/a ARHAUS FURNITURE, TIMOTHY STOVER, BRAD VOELPEL, and JESSICA DAUGHERTY, | ) ) ) ) ) | |
| Defendants. | ) | |

---

**ORDER GRANTING PRELIMINARY INJUNCTION**

---

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (ECF No. 13 (sealed)) and Supplemental Brief in Support of Motion for Preliminary Injunction (ECF No. 92). For the reasons stated below, Plaintiffs' Motion is GRANTED.

**I.  BACKGROUND**

  **A. The Corporate Entities Involved**

   **1.  A Note on Nomenclature**

Williams-Sonoma, Inc. is referred to herein as "WSI." Williams-Sonoma Direct, Inc. is referred to as "WSDI," and Williams-Sonoma Retail Services, Inc. is referred to as "WSRSI." At various places in the record, an entity known simply as "Williams-Sonoma" is referenced. When the Court can describe a particular corporate entity, the Court will do so. When the

record references "Williams-Sonoma" or generally all entities, however, the Court will use the term "Williams-Sonoma" to refer to either all or part of the conglomerated entities that include WSI and its subsidiaries.

### 2. Williams-Sonoma

Williams-Sonoma is a corporation that is primarily in the business of selling furniture and home furnishings. (October 24–25, 2014, Hr'g Tr. 41, ECF Nos. 104, 105 (sealed).) Williams-Sonoma sells its merchandise both through its 585 retail stores and through direct to consumer channels, including e-commerce. (Id. at 42.) The corporation's brands include Williams-Sonoma Home, Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, West Elm, Mark and Graham, and Rejuvenation. (Id. at 41.)

### 3. Williams-Sonoma Direct, Inc.

WSDI is a wholly-owned subsidiary of WSI that provides supply chain services to Williams-Sonoma's entities. (Id. at 42.) WSDI was incorporated in 1999. (Id.) It has approximately $165 million in assets and employs approximately 3500 people in several states, including California, New Jersey, and Tennessee. (Id. at 43.)

### 4. Williams-Sonoma Retail Services Inc.

WSRSI has approximately $50 million in assets and employs approximately 800 people. (Id.) It is responsible for stocking

Williams-Sonoma's retail stores as well as moving furniture. (<u>Id.</u> at 48.)

### 5. Arhaus, LLC

Arhaus, LLC ("Arhaus") has approximately fifty-two retail stores and sells special-order furniture. (<u>Id.</u> at 499.) Although no evidence was introduced indicating the exact revenue of either WSI or Arhaus, witness testimony indicated on numerous occasions that Arhaus is a significantly smaller company. (<u>See, e.g.</u>, <u>id.</u> at 126 ("Arhaus would probably not get as good a rate because they don't have the volume [of Williams-Sonoma] . . . ."); December 10, 2014, Hr'g at 45 ("[Williams-Sonoma's] carrier rates were ridiculous because they were rates that [Arhaus] could never get because we are so small."), ECF No. 140.)

### B. Procedural Background

WSDI filed its Complaint on September 18, 2014 (ECF No. 1) and a Motion for Temporary Restraining Order on September 19, 2014 (ECF No. 13). Judge Samuel H. Mays, Jr. held a hearing on the Motion for Temporary Restraining Order on September 29 and 30, 2014. (ECF Nos. 52, 54.) Arhaus and Stover filed a Joint Motion to Dismiss on September 26, 2014. (ECF No. 31.) On September 29, 2014, WSDI amended the Complaint so as to correct a technical pleading defect. (ECF No. 51.) On September 30, 2014, Judge Mays issued an order granting in part and denying in part the Motion for Temporary Restraining Order. (ECF No. 56.)

The order required Defendants to preserve evidence, and ordered Defendants not to acquire, access, disclose, or use any of WSDI's trade secrets -- or to attempt to do so. (Id. at 3-4.) The order further restrained Daugherty and Stover from: acquiring, accessing, disclosing or using, or attempting to acquire, access, disclose, or use WSDI's or its derivatives' confidential information; and from soliciting employees of WSDI, its parents, subsidiaries, or affiliates. (Id. at 4.)

On October 14, 2014, the Court set a preliminary injunction hearing and, by consent, extended the TRO. (ECF No. 73.) Plaintiffs filed their Second Amended Complaint on October 22, 2014, which added Williams-Sonoma Retail Services, Inc. as a plaintiff. (ECF No. 83.) Plaintiffs then filed a Supplemental Brief in Support of Motion for Preliminary Injunction on October 23, 2014. (ECF No. 92.) Defendants each filed briefs in opposition to a preliminary injunction also on October 23, 2014. (ECF Nos. 94–100.) The Court held a preliminary injunction hearing on October 24 and 25, 2014 and December 10, 2014. (ECF Nos. 102, 104,[1] 141.) By consent of the parties (see ECF No. 106), on November 3, 2014, the Court extended the TRO until an order issued regarding the Plaintiffs' request for preliminary injunction. (ECF No. 109.)

---

[1] The ECF Docket incorrectly lists the second day of the preliminary injunction hearing as October 28, 2014; the second day of the hearing was in fact held on Saturday, October 25, 2014.

Stover filed a Motion to Dismiss and in the Alternative Motion for Summary Judgment on November 5, 2014. (ECF No. 111.) Arhaus filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment on November 10, 2014. (ECF No. 115.) Plaintiffs filed their response to these motions on December 11, 2014. (ECF No. 134.) The Court denied in part these motions on January 30, 2015. (ECF No. 160.)

By joint motion of Plaintiffs and Voelpel (ECF No. 121), the Court granted a Permanent Injunction and Judgment as to Voelpel on December 3, 2014. (ECF Nos. 128, 129.) Similarly, by joint motion of Plaintiffs and Daugherty (ECF No. 132), the Court granted a Permanent Injunction and Judgment as to Daugherty on December 19, 2014. (ECF Nos. 145, 146.)

## II. **TESTIMONY AND EVIDENCE INTRODUCED BY THE PARTIES**

For the purposes of this Order, the Court makes the following factual findings.

### 1. **Williams-Sonoma's Confidential Information**

Most of the confidential information involved in this case is related to Williams-Sonoma's supply chain management. Steve Anderson, Williams-Sonoma's Senior Vice President of Operations, explained that managing Williams-Sonoma's supply chain entails

> managing the movement of our purchased or manufactured
> merchandise from point of origin or manufacture to the
> United States or to the point where we are going to
> sell it, from that point, moving it to our
> distribution centers, and then ultimately warehousing

> that merchandise and then ultimately delivering it to
> our customer, whether it's delivering it directly to
> somebody's home or replenishing one of our 585 retail
> stores throughout the country.

(October 24–25, 2014, Hr'g Tr. 60.)  Efficiently managing a

supply chain can result in significant savings for a company:

recent initiatives at Williams-Sonoma have yielded tens of

millions of dollars in savings over the past few years.  (See

id. at 62.)  Examples of areas where such savings can be

generated include the software systems that are used, the number

of distribution centers a company maintains, and how contracts

are negotiated with third-party transporters, including ocean

carriers and trucking companies.  (See id.)  Williams-Sonoma

stores some of this type of information on a shared drive that

its employees can access.  (See id. at 237–38.)

Details of a corporation's supply chain management can be

useful to competing organizations.  For example, pricing

information with third-party vendors can provide a competing

organization with a benchmark that can be leveraged in the

negotiating process.  (See id. at 76.)  The contents of

contracts that include non-disclosure clauses can provide a

competitive advantage.  (See id. at 90-91.)  Additionally, the

process by which a company solicits bids and ultimately picks a

third-party vendor can be of value to a competitor.  (See id.

at 159-61.)

Williams-Sonoma employs a number of measures to protect its confidential information, including the details of its supply chain management. (Id. at 66-67.) A log-on is required to get into the network system, which is provided by each employee's manager. (Id.) Each employee's access to the network is restricted based on the position the employee is in and what the employee needs to know. (Id.) Additionally, when an employee is hired by Williams-Sonoma, the employee is given a handbook that explains Williams-Sonoma's confidential information policies as well as how electronic information is handled. (Id. at 66.) Employees must also sign the Williams-Sonoma, Inc. Code of Business Conduct and Ethics ("Code of Conduct") (Ex. 1) every year and take a quiz on the contents of the Code of Conduct. (October 24-25, 2014, Hr'g Tr. 66-67.)

The Code of Conduct describes in some detail an employee's duties to protect Williams-Sonoma's confidential information. (See Ex. 1 at 10-11.) Two provisions of the Code of Conduct are at issue in this case. One provision describes the nature of the employee's duty to protect that information:

> As associates of the Company, and for the benefit of ourselves as well as the Company, we each have a duty to safeguard our Company's trade secrets and Confidential Information and to refrain from any improper dealings with the confidential information of any other company, including our competitors. Associates may not disclose Confidential Information either while an employee of WSI or at any time after

employment ends, regardless of the reason why employment ends.

(Id.)  Another provision prohibits solicitation of Williams-Sonoma employees:

> As part of our duty to safeguard the Company's trade secrets and Confidential Information, associates may not, either during their employment with the Company or for twelve months afterward, directly or indirectly recruit, solicit or induce . . . any employee . . . of the Company to terminate employment.

(Id. at 11.)

## 2. Defendants' Misconduct

Having described the nature and value of the confidential information at issue in this case, the Court now turns to the facts established regarding Defendants' misconduct.  Stover worked for Williams-Sonoma for seventeen years.  (October 24-25, 2014, Hr'g Tr. 63.)  At the time of his departure, Stover was the Senior Vice President of Transportation, Engineering, and Planning.  (Id.)  In his role, Stover had access to transportation contracts, building contracts, and leases that Williams-Sonoma considered confidential.  (Id. at 63-64.)

Stover first interviewed with Arhaus on June 17, 2014, at Arhaus' headquarters in Walton Hills, Ohio.  (Id. at 303.)  On the evening of June 17, 2014, Stover sent a text message to Jessica Daugherty, who was at that time Manager of Global Network Operations for Williams-Sonoma.  (Id. at 304-07.)  The content of the message was as follows:  "I need to know our

ocean costs from various origins to the US.  Can you provide.
[sic]  Plus what would be my linehaul costs say from [C]leveland
to [H]ouston and who would be my provider?" (Ex. 32.)  At the
hearing, Stover initially denied that he was asking for that
information in order to use it during his interviews or for use
if he was to be hired.  (October 24–25, 2014, Hr'g Tr. 308–09.)
Plaintiffs' counsel then pressed Stover on the point.  (Id. at
309–10.)  After equivocating for some amount of time, Stover
stated: "I'm not sure why I was asking other than, you know,
yeah, they do have a distribution center in Cleveland." (Id.)

Stover received an offer letter from Andrew Lobo, Chief
People Officer of Arhaus, on July 11, 2014.  (Id. at 314;
Ex. 33.)  He submitted his resignation to Williams-Sonoma on
July 18, 2014, and officially resigned on July 21, 2014.
(October 24–25, 2014, Hr'g Tr. 167, 314.)  Stover began working
for Arhaus on August 11, 2014.  (Id. at 526.)

After Stover began working at Arhaus, he sent some of
Williams-Sonoma's contracts to other employees of Arhaus,
including Greg Teed, Arhaus' Chief Finanical Officer.  (October
24–25, 2014, Hr'g Tr. 418–28; Exs. 4–7 (sealed) (all sent from
Stover's Arhaus email address).)  Stover also sent Williams-
Sonoma PowerPoint presentations to Teed and Lobo.  On September
16, 2014, Stover sent Teed a presentation that included
Williams-Sonoma's competitive assessment of Arhaus. (October 24–

25, 2014, Hr'g Tr. 732–33; Ex. 17.)  Stover sent Andrew Lobo a
human resources presentation of Williams-Sonoma's on September
12, 2014.  (December 10, 2014, Hr'g Tr. 57–58; Ex. 87.)

Stover also acknowledged that he had requested Williams-
Sonoma information from Williams-Sonoma employees after he began
working at Arhaus.  He admitted to sending such a request to
Brad Voelpel, then Director of International Transportation at
Williams-Sonoma, on August 5, 2014.  (Id. at 431–32; Ex. 37.)
In the email, Stover tells Voelpel: "Still have not received the
RFP.  Try sending to my Gmail account." (Ex. 37.)  Stover
admitted that he was asking Voelpel to send him documents with
information about the process Williams-Sonoma utilizes to bid
out contracts to ocean carriers.  (See October 24–25, 2014, Hr'g
Tr. 431–32.)  Voelpel responded by sending several documents
that outline in detail how Williams-Sonoma manages its ocean
carrier bidding process.  (See id. at 254–61; Exs. 8–11
(sealed).)  Voelpel also sent Stover an Excel spreadsheet
relevant to the ocean carrier bidding process.  (October 24–25,
2014, Hr'g Tr. 261–62; Ex. 12 (sealed).)  The spreadsheet
includes numerous data-points on hundreds of ocean routes
between various cities.  (See Ex. 12 (sealed).)  Each route in
the spreadsheet includes a dollar value for what Williams-Sonoma
actually paid in 2012 and an amount that Williams-Sonoma had set

as its target rate for that route.  (See id.; October 24–25, 2014, Hr'g Tr. 124–25.)

Stover also received confidential information from Jessica Daugherty after he began working at Arhaus.  In an email date-stamped July 28, 2014, Daugherty forwarded Stover an email that included a "break-down of the Network Team's responsibilities" at Williams-Sonoma.  (October 24–25, 2014, Hr'g Tr. 435–36; Ex. 39 at 2.)  Stover acknowledged that he replied to Daugherty, "Good email.........no response?  Might want to stick to gmail and not my Arhaus email since it may be looked at moving forward along with your phone and texts.  Just be careful....." (October 24–25, 2014, Hr'g Tr. 435–36; Ex. 39 at 1.)  On August 11, 2014, Daugherty sent Stover contact information for sales representatives for a number of third-party vendors.  (October 24–25, 2014, Hr'g Tr. 680–83; Exs. 62, 63.)  Daugherty admitted that she sent her resume to Stover on July 28, 2014.  (October 24–25, 2014, Hr'g Tr. 685; Ex. 64.)  Plaintiffs' counsel then asked Daugherty, "And around the same time you downloaded or uploaded 37,000 files from your -- from Williams-Sonoma into an external hard drive, correct?"  (October 24–25, 2014, Hr'g Tr. 686.)  Daugherty responded, "It seems to have the same funny timing."  (Id.)

Williams-Sonoma became aware that Stover was asking employees for confidential information as early as September 11,

2014.  (See October 24–25, 2014, Hr'g Tr. 171–75; Exs. 22, 23.)
Williams-Sonoma's loss prevention department began investigating
under the direction of the legal group.  (October 24–25, 2014,
Hr'g Tr. 174.)  Daugherty and Voelpel were both interviewed and
terminated as a result of sending information to Stover.  (Id.
at 175.)

Three people reviewed Stover's electronic activities
surrounding the time of his departure from Williams-Sonoma and
hiring at Arhaus.  Jim KempVanEe, a neutral computer forensics
specialist, analyzed Stover's laptop that he used with Arhaus as
well as several of Stover's personal devices.  (See Ex. 51.)
Karen Slocum, an IT Security Manager with Williams-Sonoma,
investigated Stover's use of Williams-Sonoma's networks prior to
his departure.  (October 24–25, 2014, Hr'g Tr. 549–71.)  Lastly,
Anthony Merlino, a computer forensic specialist with Document
Technologies ("DTI"), analyzed the computer that Stover had used
at Williams-Sonoma.  (Id. at 572–631.)

KempVanEe's report included a number of relevant findings.
According to KempVanEe, there was "a dramatic increase in
accessed documents starting on 7-22-14," and "a large number of
these files appeared to be related to Williams-Sonoma."  (Ex. 51
at 5.)  As to Stover's Arhaus laptop, KempVanEe found that "at
least 36 files had been accessed from removable media," some of
which "had file names consistent with Williams-Sonoma

document[s]." (Id. at 6.) KempVanEe also analyzed Stover's Lexar thumb drive. (See id.) On the drive, he "located over 500 files and folders that had been created between 07-07-14 and 07-17-14, most of which appeared [to] be William[s]-Sonoma documents." (Id.) KempVanEe noted that many of the documents "had been deleted and some over written," and that "[s]ome of the deleted documents had not been deleted until sometime between 09-12-14 and 09-23-14." (Id.) KempVanEe's report also included a list of removable storage drives that had been connected to Stover's home desktop and to Stover's Arhaus computer. (Id. at 5, 6.)

Slocum found that Stover's user ID had not been used to access Williams-Sonoma's shared drive in 2014 until June of that year. (October 24–25, 2014, Hr'g Tr. 557.) Slocum also found that in June 2014, Stover's user ID was used to open or copy hundreds of files. (See id. at 551–54; Ex. 12.)

Merlino performed a forensic analysis of Stover's Williams-Sonoma computer, resulting in two significant findings. First, Merlino found evidence that Stover had installed and used software for "anti-forensic" purposes. (October 24–25, 2014, Hr'g Tr. 577–78.) The evidence suggested that Stover installed the software on July 20, 2014. (Id. at 578.) Second, by referencing the KempVanEe report, Merlino found strong evidence

that Stover had inserted the same thumb drive into both his Williams-Sonoma and Arhaus computers. (<u>Id.</u> at 602-04.)

Stover admitted that he had deactivated his Gmail account, but denied doing so after receiving notice of his duty to preserve evidence. (<u>Id.</u> at 439.) Stover acknowledged that he had received a letter demanding that he preserve evidence on September 18, 2014. (<u>Id.</u> at 437; Ex. 40.) He also acknowledged that he sent an email to Daugherty through his Gmail the morning of September 18, 2014. (October 24-25, 2014, Hr'g Tr. 441.) As to whether he deactivated his Gmail after receiving the demand letter, Stover then testified: "I don't believe so, but I didn't do it intentionally or dishonestly here. I'm just saying I don't recall. Obviously, it was still open that morning early." (<u>Id.</u> at 442.)

Evidence was also introduced related to Plaintiffs' claim that Stover violated his non-solicitation agreement with Williams-Sonoma. Stover admitted that he had sent an email on September 5, 2014, to Eric Marsiglia, then an employee of Williams-Sonoma, in which he said: "You were always so important to what I did and you actually carried me most of the time. I can get you to a VP level I know so hang on if you can." (<u>Id.</u> at 433; Ex. 38.) After initially equivocating, Stover acknowledged that "clearly I'm stating I can get you to a VP level [at Arhaus]." (October 24-25, 2014, Hr'g Tr. 433-34.)

Additionally, Stover arranged for Daugherty to be interviewed at Arhaus. Stover forwarded Daugherty's resume to Andrew Lobo and Greg Teed, Arhaus' Chief Financial Officer, on July 28, 2014. (December 10, 2014, Hr'g Tr. 65; Ex. 88.) In the email, Stover represented that Daugherty was "a young lady we should hang onto for future opportunities," and that "[o]ne day we could use someone of her talents as we grow." (Ex. 88.) Lobo responded to Stover: "Sweet. Will definitely hold and discuss in near future." (December 10, 2014, Hr'g Tr. 66; Ex. 89.) Daugherty subsequently had an interview with Lobo and Teed at Arhaus on August 22, 2014. (October 24-25, 2014, Hr'g Tr. 684-85.) Lobo learned of Stover's non-solicitation agreement with Williams-Sonoma two days earlier, on August 20, 2014. (December 10, 2014, Hr'g Tr. 68.)

## III. **CONCLUSIONS OF LAW**

Plaintiffs request that a preliminary injunction issue that includes all the injunctive requirements currently in the TRO. (ECF No. 92 at 1.) Plaintiffs additionally request the following relief:

> a preliminary injunction that (a) enjoins Defendant Stover from working for Arhaus for a period of time sufficient to protect against misuse of WSDI's trade secrets; (b) enjoins Arhaus from permitting any employee who received WSDI's information from, directly or indirectly, engaging in, assisting in, or advising on the negotiation or drafting of Arhaus agreements with ocean carriers, line-haul carriers, or furniture home delivery vendors for a period of two

years; and (c) requires third party monitoring, paid
for by Stover and Arhaus, to ensure that Defendants
are compliant with the foregoing.

(Id.)

"The purpose of a preliminary injunction is merely to
preserve the relative positions of the parties until a trial on
the merits can be held." Univ. of Texas v. Camenisch, 451 U.S.
390, 395 (1981). "Accordingly, a party 'is not required to
prove his case in full at a preliminary injunction hearing and
the findings of fact and conclusions of law made by a court
granting the preliminary injunction are not binding at trial on
the merits.'" Certified Restoration Dry Cleaning Network,
L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007)
(quoting Camenisch, 451 U.S. at 395).

In determining whether injunctive relief is proper in a
diversity case, the Court applies its "own procedural
jurisprudence regarding the factors to consider . . . ." Id. at
541. Four factors are used by the Sixth Circuit to determine
whether injunctive relief is appropriate: (1) the likelihood of
success on the merits; (2) whether the injunction will save the
plaintiff from irreparable injury; (3) whether the injunction
would cause substantial harm to others; and (4) whether the
public interest would be served by the injunction. Id. at 542.
"These four considerations are factors to be balanced, not

prerequisites that must be met." Id. (internal quotation marks omitted).

Plaintiffs argue that all four factors weigh in favor of granting the preliminary injunctive relief requested. (E.g., ECF No. 143.)

Defendants oppose the relief requested, albeit for different reasons and to different degrees. Arhaus concedes that some preliminary injunctive relief is appropriate. (ECF No. 142 at 2 (stating that the correct remedy in this case is to require Defendants to return Williams-Sonoma's materials and to restrain Defendants from using, disclosing, or accessing those materials).) Arhaus, however, argues that the balance of the factors weighs against two aspects of the relief sought by Plaintiffs: (1) preventing Stover from performing supply chain functions for Arhaus; and (2) preventing Arhaus employees that received any Williams-Sonoma information from Stover from having contact with third-party vendors. (Id.)

In contrast, Stover argues that no injunctive relief is appropriate in this case. (ECF No. 144.) Stover goes so far as to argue that all four of the factors weigh against granting any relief. (ECF No. 144.)

The Court considers each of the four factors in turn.

## A.   Likelihood of Success on the Merits

The Third Amended Complaint alleges five causes of action against Arhaus and Stover: (1) misappropriation of trade secrets in violation of the Tennessee Uniform Trade Secrets Act ("TUTSA") (as to both Defendants); (2) breach of contract (as to Stover); (3) breach of the duty of loyalty (as to Stover); (4) tortious interference of contract (as to both Defendants); and (5) violations of the Computer Fraud and Abuse Act (as to Stover).  (3d Am. Compl. ¶¶ 54-98, ECF No. 163.)  Plaintiffs only argue a likelihood of success on the merits as to their first two causes of action.[2]  (See ECF Nos. 92, 143, and 147.) Accordingly, the Court narrows its analysis of Plaintiffs' claims to those first two claims.  Because the Parties have stipulated that Tennessee law applies as to the first four causes of action (TRO Hr'g 14-15 (sealed)), the Court considers the likelihood of success under Tennessee law.

### 1.   Misappropriation of Trade Secrets

Trade secrets are protected in Tennessee by the Tennessee Uniform Trade Secrets Act ("TUTSA").  See Tenn. Code Ann. § 47-25-1702(1) et seq.  The "TUTSA lists three requirements for information to be considered a trade secret: (1) the information must derive independent economic value from not being generally

---

[2] They do not appear to concede in any way that there is no likelihood of success on the merits as to their other causes of action.  Plaintiffs instead appear to argue that a likelihood on the merits as to the first two causes of action is sufficient for the preliminary injunctive relief they seek.

known, (2) others could obtain economic value from its disclosure or use, and (3) efforts have been made to maintain its secrecy." <u>J.T. Shannon Lumber Co. v. Barrett</u>, 2:07-cv-2847-JPM-cgc, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010) (citing Tenn. Code Ann. § 47-25-1702(4)).

The TUTSA prohibits misappropriation of trade secrets, providing for both injunctive relief and damages. Tenn. Code Ann. §§ 47-25-1701 to 47-25-1709. "Misappropriation" means, in relevant part, either acquisition by a person who knows or has reason to know the trade secret was acquired by improper means, or disclosure without consent of a trade secret by a person who knows or has reason to know that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. § 47-25-1702(2). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." § 47-25-1702(1).

Defendants argue that Plaintiffs have failed to show a likelihood of success against Stover as to their TUTSA claim because there was neither evidence that Arhaus or Stover used the trade secrets at issue nor evidence that there was any detriment to WSDI. (ECF No. 95 at 4-11; ECF No. 142 at 13; ECF No. 144 at 5.) In support of their arguments, Defendants cite <u>Stratienko v. Cordis Corp.</u>, 429 F.3d 592, 600 (6th Cir. 2005).

This citation, though, is inapposite. <u>Stratienko</u> describes the elements of misappropriation of a trade secret under Tennessee common law -- not under the TUTSA. <u>See</u> <u>id.</u> at 597 (noting that Stratienko did not appeal the district court's rejection of his TUTSA claim). <u>Stratienko</u> is therefore irrelevant for two reasons. First, Plaintiffs did not plead a violation of Tennessee common law protecting trade secrets. Second, even if they had done so, such a claim would have been preempted by the TUTSA. Tenn. Code Ann. § 47-25-1708(a) (stating that the TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret"); <u>Ram Tool & Supply Co. v. HD Supply Const. Supply, Ltd.</u>, No. M2013-02264-COA-R3CV, 2014 WL 4102418, at *11-14 (Tenn. Ct. App. Aug. 19, 2014) (citing with approval <u>Hauck Mfg. Co. v. Astec Indus., Inc.</u>, 375 F. Supp. 2d 649, 658 (E.D. Tenn. 2004) (holding that the TUTSA preempts any non-contractual common law claim that "would succeed or fail dependent on proof" of the misappropriation of a trade secret)).

Under the plain meaning of the TUTSA, proving misappropriation requires only evidence of acquisition by improper means. <u>See</u> Tenn. Code Ann. § 47-25-1702(2). It does not require proof that the trade secret has actually been used. <u>See</u> <u>id.</u> Nor does the TUTSA require proof of detriment outside the misappropriation or disclosure itself. <u>See</u> <u>id.</u> The TUTSA

indicates that harm to the owner of a trade secret is inherent
in its misappropriation or disclosure.  See § 47-25-1704
(stating that damages "can include both the actual loss caused
by misappropriation and the unjust enrichment caused by
misappropriation that is not taken into account in computing
actual loss").  When information that derives value from not
being generally known becomes more widely known, its value is
necessarily diminished.  See Ruckelshaus v. Monsanto Co., 467
U.S. 986, 1011 (1984) ("Once the data that constitute a trade
secret are disclosed to others, or others are allowed to use
those data, the holder of the trade secret has lost his property
interest in the data.")  Plaintiffs therefore need only
establish a likelihood of success in showing that they possessed
a trade secret that Defendants misappropriated or disclosed.

     The record is replete with evidence that establishes a
likelihood of success in demonstrating that Defendants
misappropriated Plaintiffs' trade secrets.  On the evening of
Stover's first interview with Arhaus, he started gathering
information for Arhaus' benefit.  (October 24-25, 2014, Hr'g Tr.
303, 308-309.)  That evening, he asked Daugherty, then an
employee of WSDI, the linehaul costs from Cleveland to Houston,
and who would be the best provider.  (Id. at 308-09.)  Stover
admitted that he asked for the information because Arhaus "ha[s]
a distribution center in Cleveland." (Id. at 309-10.)  After

resigning, Stover repeatedly asked for -- and received -- confidential information regarding Williams-Sonoma's supply chain from Williams-Sonoma employees. (See, e.g., id. at 254-61, 431-32, 435-36, and 680-86.) One such document included detailed pricing information on hundreds of shipping routes used by Williams-Sonoma. (See Ex. 12 (sealed).) Stover proceeded to distribute confidential information to high-level executives at Arhaus, including Gregg Teed, the Chief Financial Officer, and Andrew Lobo, the Chief People Officer. (See, e.g., October 24-25, 2014, Hr'g Tr. 418-28, 432-33; December 10, 2014, Hr'g Tr. 32-34.)

The record also indicates that Stover remained in possession of significantly more confidential details of Williams-Sonoma's supply chain than those that were specifically admitted. After not having used his user ID to access Williams-Sonoma's shared drive in 2014 at all, the user ID was suddenly used in June 2014 to open or copy hundreds of files. (See October 24-25, 2014, Hr'g Tr. 551-3, 557.) Additionally, Stover's Lexar thumb drive includes over 500 files and folders created between July 7, 2014, and July 17, 2014, that the neutral computer forensics specialist determined appeared to be Williams-Sonoma documents. (Ex. 51 at 5-6.)

Many of the documents that Stover misappropriated constitute trade secrets under the TUTSA. As noted in Part

II.B.1, supra, details of a corporation's supply chain management can be useful to competing organizations. As a result, such information has value to the possessor due to not being known by the competitor, thus providing a market advantage. Further, substantial efforts were taken by Plaintiffs to maintain the secrecy of the details of their supply chain management. See Part II.B.1, supra.

The Court finds that Plaintiffs have met their burden in establishing a likelihood of success on the merits of their TUTSA action.

**2. Breach of Contract**

In the Order denying in part Stover's and Arhaus' Motions to Dismiss and in the Alternative for Summary Judgment (ECF No. 160), the Court found that the Code of Conduct (Ex. 1) was a binding contract between Plaintiffs and Stover for the following reasons:

> A document such as an employee handbook is contractually binding under Tennessee law when it "contain[s] specific language showing the employer's intent to be bound by the handbook's provisions." Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677, 687 (Tenn. Ct. App. 1999) (quoting Rose v. Tipton Cnty. Pub. Works Dep't, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997)). The Code of Conduct specifically states that it "serves as an agreement between you and the Company" (ECF No. 13-6 at PageID 95) and that the agreement is "in exchange for your employment, and the payment to you of salary, bonus, equity awards, and other compensation" (id.). Because the language unambiguously shows an intent to be bound, the Code of Conduct is a contract.

> At the TRO hearing, the individual Defendants did not
> contest that they each signed the Code of Conduct.
> The individual Defendants were thus parties to the
> contract.
>
> To determine whether Plaintiffs were parties to the
> Code of Conduct, the Court looks to the language of
> the contract itself.  There are three provisions in
> the Code of Conduct relevant to determining whether or
> not Plaintiffs were parties to the contract:
>
> > 1.  References in the Code of Conduct to we, us, our,
> >     Williams-Sonoma, WSI or the Company are generally
> >     intended to mean Williams-Sonoma, Inc. and all
> >     its affiliates, divisions, brands and
> >     subsidiaries, including its global subsidiaries,
> >     stores and offices.  (Id. at PageID 94.)
> >
> > 2.  This Code of Conduct also serves as an agreement
> >     between you and the Company.  (Id. at PageID 95.)
> >
> > 3.  [W]e ask you to enter into this agreement, in
> >     exchange for your employment, and the payment to
> >     you of salary, bonus, equity awards and other
> >     compensation.  (Id.)
>
> It is not contested that WSDI and WSRSI are
> subsidiaries of WSI.  Therefore, references to "the
> Company" in the contract also include WSDI and WSRSI.
> The Code of Conduct specifically states that it serves
> as an agreement between the employee "and the
> Company," which includes WSDI and WSRSI.

Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 304 F.R.D. 520, 528

(W.D. Tenn. 2015).

Most of the Court's factual findings in the previous Order

were established during the preliminary injunction hearing.  The

record reflects that Stover signed the Code of Conduct (Ex. 30),

and that WSDI is a subsidiary of WSI (see October 24-25, 2014,

Hr'g Tr. 42).  Additionally, both Arhaus and Stover concede that

WSRSI is a subsidiary of WSI.  (Def. Arhaus, LLC's Answer &

Separate Defenses to Pls.' 3d Am. Compl. ¶ 4, ECF No. 167; Def. Stover's Answer to 3d Am. Compl. ¶ 4, ECF No. 168.) Accordingly, the Court finds that Plaintiffs have established a likelihood of success of showing that WSDI, WSRSI, and Stover were parties to the contract.

As to breach, Stover initially argues that he "has not solicited or recruited any employee of WSI." (ECF No. 100 at 10.) Instead, Stover argues that he "responded to overtures from WSI employees, who were unhappy with their positions." (Id.)

The Court finds that Plaintiffs have established a likelihood of success on the merits as to their breach of contract claim against Stover. The Code of Conduct specifically prohibits recruiting any of Williams-Sonoma's employees for a period of twelve months after leaving Williams-Sonoma. (Ex. 1 at 11.) The record firmly establishes that Stover tried on multiple occasions to recruit at least two Williams-Sonoma employees within months of leaving. (See, e.g., October 24–25, 2014, Hr'g Tr. 433–34 (acknowledging that he told Eric Marsiglia that he could "get [Marsiglia] to a VP level" at Arhaus); id. at 684–85 (arranging for an interview of Daugherty at Arhaus).) Stover's actions went far beyond simply "respond[ing] to overtures."

Similarly for the reasons stated in Part III.A.1, supra, the facts support a finding that Stover violated his contractual duties to protect "confidential information" as defined in the Code of Conduct.

Accordingly, the Court finds that WSDI has established a likelihood of success on this claim.

### B. Irreparable Injury

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 578 (6th Cir. 2002). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992.)

"Damages in trade secrets cases are difficult to calculate . . . ." Avery Dennison Corp. v. Four Pillars Enter. Co., 45 F. App'x 479, 485 (6th Cir. 2002). This results in part from the disparate nature of the harm that misappropriation of trade secrets can cause a corporation, including reduced volume of sales, lower profit margin, the cost of remedial efforts, reduction in capital value, and development costs. See generally, Michael A. Rosenhouse, Proper Measure and Elements of Damages for Misappropriation of Trade Secrets, 11 A.L.R.4th 12 (1982).

Similarly, the loss of employees to a competitor in breach of a non-solicitation agreement results in damages that are hard to calculate. In a slightly different context, the Eighth Circuit noted that the violation of a non-solicitation agreement as to customer accounts resulted in irreparable harm. N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984). According to the Eighth Circuit, a lack of a preliminary injunction would leave the plaintiff "with the Hobson's choice of either filing a separate lawsuit for damages (or at least an amendment to an initial suit) each time one of the defendants solicited away another . . . customer or waiting until [plaintiff's] customers and goodwill had been completely drained away." Id. This logic applies equally in the employee non-solicitation context. A failure to issue injunctive relief would result in an analogous Hobson's choice every time an employee was solicited.

Accordingly, because Plaintiffs have demonstrated a strong likelihood of success on the merits of both their TUTSA and breach of contract claims, they have demonstrated irreparable injury.

### C. Substantiality of Harm to Others

There is no indication that injunctive relief would cause any harm to anyone other than the parties. The Sixth Circuit, however, has held that "in deciding whether to grant a preliminary injunction, the district court must consider the

harm that the injunction would cause the non-movant." Brake
Parts, Inc. v. Lewis, 443 F. App'x 27, 33 (6th Cir. 2011)
(citing Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc., 453
F.3d 377, 382 (6th Cir. 2006)). The harm to a defendant may be
discounted, though, when there is evidence that the defendant
"knowingly and illegally" placed itself in a position to be
harmed by injunctive relief. Id.

Defendants argue that two aspects of the injunctive relief
sought would cause them substantial harm: (1) restraining Stover
from working for Arhaus; and (2) restraining certain Arhaus
employees from being involved in negotiations with third-party
vendors. The Court addresses each argument in turn.

Even though Stover and Arhaus appear to have "knowingly and
illegaly" placed themselves in a position to be harmed by
injunctive relief, the Court still finds that restraining Stover
from being employed by Arhaus would cause substantial harm to
both. Andrew Lobo testified regarding the extensive search that
Arhaus utilized before ultimately hiring Stover (December 10,
2014, Hr'g Tr. 17-22), which would likely have to be repeated
were Stover restrained. Moreover, while that search would be
ongoing, it is apparent from the record that Arhaus would be
left with no employee qualified to manage its supply chain. The
harm to Stover is obvious and significant. Restraining Stover
from working for Arhaus would deprive him of his current

employment and likely his source of income, as there is no guarantee that Arhaus would continue to pay him while the preliminary injunction remains in effect.

As to the sought-after relief to restrain any Arhaus employees that received any of Plaintiffs' confidential information from having any involvement in negotiations with third-party vendors for two years, Arhaus argues that its competitive position would be severely damaged. The Court agrees that this would result in substantial harm to Arhaus. The evidence indicates that such a restriction would harm Arhaus' ability to engage in negotiations at all -- for example, by preventing the CFO from even reviewing important agreements before they are signed.

### D. Public Interest

There are three significant areas in of interest that are at stake in this action. First, there is a public interest in "enforcing contract terms as they were intended by the parties." Interox Am. v. PPG Indus., Inc., 736 F.2d 194, 203 (5th Cir. 1984); see also ProductiveMD, LLC v. 4UMD, LLC, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011) ("In drafting the TUTSA, '[t]he Tennessee legislature adopted the definition of 'trade secrets' under the Uniform Trade Secrets Act, and also adopted additions which make Tennessee's definition even broader than the definition in the Uniform Act.'" (quoting Hamilton-Ryker Grp.,

LLC v. Keymon, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan. 28, 2010) (alteration in original)). Second, in considering the public interest served by an analogous Ohio statute to TUTSA, the Sixth Circuit recognized that "the public has an interest in discouraging unfair trade practices." Hoover Transp. Servs., Inc. v. Frye, 77 F. App'x 776, 785 (6th Cir. 2003). Third, in Tennessee, "restraints of trade are disfavored." PartyLite Gifts, Inc. v. Swiss Colony Occasions, No. 3:06-CV-170, 2006 WL 2370338, at *9 (E.D. Tenn. Aug. 15, 2006) (quoting AmeriGas Propane, Inc. v. Crook, 844 F. Supp. 379, 390 (M.D. Tenn. 1993)) aff'd, 246 F. App'x 969 (6th Cir. 2007).

These three interests weigh in favor of some -- but not all -- of the relief that Plaintiffs seek. Restraining Stover from violating his non-solicitation agreement would further the public interest in enforcing contracts. Similarly, restraining Defendants from profiting from Plaintiffs' trade secrets would promote the public interest in discouraging unfair trade practices. In contrast, restraining Stover from working for Arhaus would be contrary to the public's interest against restraints on trade -- as would restraining the activities of employees at Arhaus.

**E. Balance of the Factors**

The four factors in determining whether to grant a preliminary injunction "are not prerequisites, but are factors that are to be balanced against each other." Overstreet, 305 F.3d at 573. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Id.

The primary disagreement of the parties is how to balance the factors -- specifically as to restraining Stover's employment and the activities of Arhaus employees. Plaintiffs argue that such relief is appropriate in light of the "nature of the information that Stover stole and the competitive relationship between WSDI and Arhaus," as well as "the dishonesty and bad faith that accompanied Stover's actions." (ECF No. 92 at 12, 13, 15.) Plaintiffs give two principal reasons that these measures should be taken. First, Plaintiffs argue that the nature of the trade secret knowledge that Stover possesses is such that there is a sufficient threat of misuse. Plaintiffs assert that Stover will inevitably disclose his knowledge of WSI's trade secrets. Plaintiffs contend that based on the nature of Stover's knowledge alone the balance of the equities favors restraining his employment. (See e.g., ECF No. 92 at 10-12; ECF No. 143 at 2-4.) Second, Plaintiffs argue that

Stover's previous bad faith weighs heavily in their favor. (See e.g., ECF No. 92 at 13-14; ECF No. 143 at 7-9.)

Stover and Arhaus raise two main arguments to support their assertion that the balance of the factors weighs against the restraints that Plaintiffs seek. First, Defendants argue they no longer have access to any of the trade secrets that Stover took. (ECF No. 142 at 9; ECF No. 144 at 6.) Second, they argue that the information that Stover retains in his head is unlikely to constitute trade secret information that needs protecting. (ECF No. 142 at 11-13 (citing Am. Airlines, Inc. v. Imhof, 620 F. Supp. 2d 574, 576 (S.D.N.Y. 2009)); ECF No 144 at 11-14.)

Defendants' reliance on Imhof is well-placed. Imhof concerned a former employee of American Airlines, Inc. ("American"). 620 F. Supp. 2d at 576. Imhof worked for American for twenty-two years. Id. At the time he left, Imhof served as managing director of sales for American, covering the greater New York region. Id. "His responsibilities required familiarity with American's travel agency compensation policies, contracts with and strategies toward major customers, and competitive conditions." Id.

Imhof contacted Delta Airlines, Inc. ("Delta") in mid-March 2009 regarding a job opportunity, resigned from American on April 28, 2009, and began work at Delta on May 1, 2009. Id. Eight days before Imhof resigned, he attended American's sales

board meeting in Dallas, which "included discussion of what American claims was sensitive competitive information." <u>Id.</u> at 577.

In the month before his departure, he sent emails to himself at his personal email address and attached documents "relating to American's business and/or his work at American." <u>Id.</u> Days before his resignation, he brought in an external hard drive "to which he copied both personal and American documents that were stored . . . on his American laptop computer." <u>Id.</u> A few days later, "he purchased a Blackberry for the purpose . . . of transferring the contacts on his American-issued Blackberry to his own." <u>Id.</u>

Following Imhof's departure, American reviewed his emails, and discovered the proprietary information that Imhof had sent to his family email address. <u>Id.</u> at 578. American further discovered that Imhof had copied files to an external hard drive. <u>Id.</u> In response, American sent a demand to Delta that Imhof cease his employment. <u>Id.</u> Delta placed Imhof "on something akin to administrative leave." <u>Id.</u>

The <u>Imhof</u> court found that a preliminary injunction restraining Imhof from working would likely cause him substantial harm. <u>Id.</u> at 586. Further, the court found that the harm to American was speculative as a result of Imhof's inability to access any more information at the time of the

order than was in his memory.  See id. at 584-85; 587.  The
Court therefore declined to restrain Imhof from working for
Delta.  Id. at 587.

The Court agrees with Plaintiffs that some injunctive
relief is appropriate, but finds that the factors weigh against
either restraints on Stover's employment or on the activities of
Arhaus employees.  As in Imhof, "it is well to bear in mind that
we are dealing with an individual responsible for [business
processes] distinct, for example, from a food chemist privy to
the secret formula for Coca-Cola or even a salesman for a highly
specialized, technical product used only by small numbers of
obscure manufacturers."  Id. at 582.  Stover, like Imhof, had
access to a great deal of sensitive information.  Like Imhof --
and contrary to Plaintiffs' suggestions -- many of the
competitively advantageous details of that information are
unlikely to reside in Stover's head.  Stripped of the minutiae,
much of the information that Stover likely retains in his head
is of the type that one would find in any business school class
on supply chain management.  Accordingly, a restraint on
Stover's employment would be excessive.

As to the requested restraints on Arhaus employees, the
Court finds that degree of the harm to Arhaus similarly does not
justify such a burden.  There is no evidence of any ongoing use
of the information that Stover forwarded, so any further harm to

Plaintiffs based on Arhaus employees' previous possession of this sensitive information is purely speculative.

Moreover, the balance of the factors weighs against appointing a third-party monitor. The appointment of a third-party monitor to ensure compliance with an order is an extraordinary remedy. See Sierra Club v. U.S. Army Corps of Engineers, 701 F.2d 1011, 1044 (2d Cir. 1983). The circumstances of this case do not justify such an extreme measure. Defendants have ongoing discovery obligations. To the extent any violation of this Order is revealed, Plaintiffs can move for the violating party to be held in contempt. "The purpose of a preliminary injunction is simply to preserve the status quo . . . ." United States v. Edward Rose & Sons, 384 F.3d 258, 261 (6th Cir. 2004). The balance of the factors does not indicate that a third-party monitor is necessary to maintain the status quo.

The decision not to grant all the relief requested, however, does not imply that Defendants appear to have clean hands. In contrast to Imhof, this case presents a troubling pattern of repeated instances of bad faith, both by the pilfering party and the hiring organization. Accordingly, it is appropriate that a preliminary injunction should issue.

## IV. **CONCLUSION**

For the reasons stated above, the Plaintiffs' Supplemental Motion for Preliminary Injunction, (ECF No. 92), is GRANTED. As the Court previously noted, however, the Court declines to impose all of the restrictions that Plaintiffs requested.

The Court HEREBY ORDERS Defendants:

(a) to continue to preserve evidence relevant to this dispute, including, but not limited to, relevant electronic evidence; and

(b) not to acquire, access, disclose, or use, or attempt to acquire, access, disclose, or use, any of Plaintiffs' confidential information.

Further, Stover is HEREBY PRELIMINARILY ENJOINED and RESTRAINED from:

(c) acquiring, accessing, disclosing or using, or attempting to acquire, access, disclose, or use WSDI's or its derivatives' confidential information; and

(d) directly or indirectly recruiting or soliciting any employee of WSDI, its parents, subsidiaries, or affiliates, or inducing, or attempting to induce, any employee of WSDI, its parents, subsidiaries, or affiliates, to terminate his or her employment with WSDI, including its parents, subsidiaries, and affiliates.

For the purposes of this order, confidential information of WSDI is defined as data and information relating to the business of Williams-Sonoma, Inc. or WSDI that was disclosed to any employee or former employee as a consequence of that person's employment and which is not disclosed to the public at large. (See Ex. 1 at 10-11.)

**IT IS SO ORDERED,** this 18th day of June, 2015.


                             /s/ Jon P. McCalla
                             JON P. McCALLA
                             UNITED STATES DISTRICT JUDGE